IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

VICKIE L. WALKER,

                    Plaintiff,                          CV-05-6253-ST

      v.                                       FINDINGS AND
                                       RECOMMENDATION

JO ANNE B. BARNHART, COMMISSIONER OF
SOCIAL SECURITY,

                    Defendant.

STEWART, Magistrate Judge:

### **INTRODUCTION**

        Pursuant to 42 USC § 405(g), plaintiff, Vickie L. Walker ("Walker"), seeks judicial

review of a final decision of the Commissioner of Social Security denying her application for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 USC

§§ 401-33.  For the reasons discussed below, the Commissioner's decision should be reversed

and remanded for further proceedings.

1 - FINDINGS AND RECOMMENDATION

## PROCEDURAL BACKGROUND

On October 18, 2002, Walker filed an application for DIB, alleging disability since April 19, 2001, based on piriformis syndrome[1] and chronic pain syndrome. Tr. 50-52, 62.[2]  Her application was denied initially and upon reconsideration.  Tr. 33-34, 58.  Pursuant to Walker's request, a hearing was held before Administrative Law Judge William L. Stewart, Jr. on November 10, 2004.  Tr. 317-42.  Walker, her husband, and a vocational expert appeared and testified.  Tr. 317-42.  On February 23, 2005, the ALJ issued a decision finding Walker not disabled.  Tr. 10-23.  The Appeals Council denied Walker's request for review (Tr. 5-7), making the ALJ's decision the Commissioner's final decision.  Walker filed this action on August 22, 2005.

## ALJ'S DECISION

The initial burden of proof rests upon the claimant to establish disability.  *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995), *cert denied*, 517 US 1122 (1996).  To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 USC § 423(d)(1)(A).

The Commissioner has established a five-step sequential process for determining whether a person is disabled within the meaning of the Act.  *Bowen v. Yuckert*, 482 US 137, 140 (1987); 20 CFR § 404.1520.

---

[1] Piriformis syndrome is a rare neuromuscular disorder that occurs when the piriformis muscle compresses or irritates the sciatic nerve-the largest nerve in the body.  The piriformis muscle is a narrow muscle located in the buttocks.  *See http://www.ninds.nih.gov/disorders/piriformis_syndrome/piriformis_syndrome.htm* (National Institute of Neurological Disorders and Stroke, National Institutes of Health, U.S. Department of Health and Human Services).

[2] Citations are to the page number of the transcript of the record filed with the Commissioner's Answer.

2 - FINDINGS AND RECOMMENDATION

At step one, the ALJ found that Walker had not engaged in substantial gainful activity since the alleged onset date.  Tr. 22 (Finding #2); 20 CFR § 404.1520(b).

At step two, the ALJ found that Walker has severe physical impairments, consisting of a chronic pain syndrome without a  clear physical diagnosis and a questionable piriformis syndrome.  Tr. 17, 22 (Finding #3); 20 CFR § 404.1520(c).

In step three, there is a conclusive presumption that the claimant is disabled if the Commissioner determines that the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity."  *Yuckert*, 482 US at 140-41; 20 CFR § 404.1520(d).  The criteria for these listed impairments, also called Listings, are enumerated in 20 CFR Part 404, Subpart P, Appendix 1.  The ALJ determined that Walker's impairments were not severe enough to meet or equal a listed impairment.  Tr. 17, 22 (Finding #4).

If the adjudication proceeds beyond step three, the Commissioner must assess the claimant's residual functional capacity ("RFC").  The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by his impairments.  20 CFR §§ 404.1520(e), 404.1545; Social Security Ruling ("SSR") 96-8p.  Finding that Walker's allegations regarding her limitations are "not totally credible," the ALJ determined that Walker retained the RFC to perform a significant range of light work, and could:  (1) carry up to 10 pounds frequently, with an occasional 20 pound maximum; and (2) climb stairs, stoop, bend over, kneel, crouch, and crawl occasionally.  However, he found that Walker could not climb ladders, needed to avoid vibration and hazards, and needed an opportunity to change positions.  Tr. 22 (Findings #5 and #6).

3 - FINDINGS AND RECOMMENDATION

At step four the Commissioner will find the claimant is not disabled if he or she retains the RFC to perform work he or she has done in the past.  20 CFR § 404.1520(e).  The ALJ found that Walker was able to perform her past relevant work as a secretary (DOT 201.362-030)[3] and a bookkeeper (DOT 210.382-014).  Tr. 22 (Finding #7).

If the adjudication reaches step five, the Commissioner must determine whether the claimant can perform other work that exists in the national economy.  *Yuckert*, 482 US at 141-42; 20 CFR § 404.1520(f).  The burden shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can perform.  *Yuckert*, 482 US at 141-42; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999).  If the Commissioner meets this burden, then the claimant is not disabled.  20 CFR § 404.1566.  Although he found that Walker could perform her past relevant work, the ALJ nonetheless proceeded to step five and made alternative findings. Relying upon testimony from a vocational expert, the ALJ found that Walker could perform a significant number of jobs existing in the national economy, specifically sedentary semiskilled jobs as a medical voucher clerk and a sorter.  Tr. 22 (Finding #12).

## <u>STANDARD OF REVIEW</u>

The district court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. *Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id* (citation omitted).

---

[3]  *Dictionary of Occupational Titles,* U.S. Dep't of Labor, No. 201.362-030 (4th ed., rev. 1991) ("DOT").

The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986). The Commissioner's decision must be upheld if it was based on proper legal standards, even if the evidence is susceptible to more than one rational interpretation. *Andrews*, 53 F3d at 1039-40. If substantial evidence supports the Commissioner's conclusion, the Commissioner must be affirmed; "the court may not substitute its judgment for that of the Commissioner." *Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).

## STATEMENT OF THE FACTS

### I. Walker's History

#### A. Age, Education, and Work Background

Walker was born in 1949 and married in 1975. Tr. 50. 332. She attended high school and has some college education. Tr. 68, 320. She has worked as a special education assistant, a teacher's aide, an office secretary, and a bookkeeping and sales clerk. Tr. 63, 320.

#### B. Back Difficulties Prior to Onset Date

Although the present application for DIB alleges an onset date of April 19, 2001, Walker had difficulties with her back and related problems with right buttock pain beginning in May 2000. Tr. 227. Walker has been treated by Dr. Bruce Matthews, a family practitioner, since 1988.

On May 9, 2000, Walker fell and pulled some muscles. Tr. 227. The following day, she reported right side low back pain to Dr. Matthews, who prescribed Hydrocodone and Flexeril. *Id*. Four months later on September 18, 2000, Walker reported to Dr. Matthews that she injured her back again after falling from a chair. Tr. 226. Dr. May Hindmarsh noted that Walker was in

severe discomfort and was tearful. *Id.* An x-ray of the sacrum showed evidence of a slight

deviation at the base. *Id.* Walker told Dr. Hindmarsh that the Vicoden and Ibuprofin she was

taking were not helping. Dr. Hindmarsh prescribed Celebrex and Flexeril, as well as some

samples of Celebrex. *Id*.

Three days later on September 21, 2000, Walker was still having pain in her coccyx. *Id.*

Dr. Matthews diagnosed post-traumatic coccygodynia, prescribed MS Contin and scheduled a

follow-up in one to two weeks. Tr. 226-27.

Three months later on December 13, 2000, Walker reported increasing back pain with

sciatica. Tr. 225. Her right buttock was tender, but she denied radiating symptoms. *Id.* Dr.

Matthews diagnosed sciatica with piriformis syndrome of the right buttock, administered a

steroid injection and prescribed physical therapy. *Id*.

On February 7, 2001, Dr. David M. Ehlers administered a sacral caudal injection of

anesthetic and steroids. Tr. 180. Prior to the procedure, Walker reported right paracentral

buttock pain at a level of 5 out of 10, which decreased to 4 out of 10 one hour after the injection.

*Id*. Dr. Ehlers deemed this response "suboptimal" and noted that they would "[a]wait delayed

response to steroids." *Id.*

A month later on March 7, 2001, in a physical examination by Dr. Matthews, Walker

reported improvement after the injection. Tr. 225. Among other things, Dr. Matthews diagnosed

back pain syndrome, improved after steroid injection, and chronic pain syndrome, doing well on

MS Contin. *Id.* He intended to taper down the MS Contin and recommended "continuing

aggressive rehab efforts during the time of the steroid benefit." *Id.*

///

C.  **April 2001 Onset and Subsequent Treatment**

On April 18, 2001, Walker again injured her back while working.  Tr. 308.  She bent over to deal with an aggressive child, pulled back, and felt severe pain in her lower sacral region which radiated into her left leg.  Tr. 304, 308.  By the following day, she was unable to flex at the hip and was bearing "weight-sparing pressure on her [right] leg."  Tr. 308.  The nurse practitioner examined her,  provided Toradol, Ibuprofin, and Flexeril, and advised her to stay off work until she could be seen the following week.  *Id.*

A week later on April 25, 2001, Walker was examined by Dr. Matthews, who noted that she was not sleeping, was tender in the low back, and ambulated stiffly.  Tr. 223.  Dr. Matthews diagnosed recurrent back pain and "[e]pisodic opiate use without any use at all of escalation of dose."  *Id.*  Dr. Matthews noted that Walker did not have any evidence of dysfunctional behavior related to opiates and prescribed MS Contin and muscle relaxers.  *Id.*  Dr. Matthews also noted that Walker "may need a steroid injection at some point, but this is an acute injury right now, basically representing an acute low back strain on chronic low back episodic pain."  *Id.*

By May 8, 2001, Walker's pain was worsening, or at least not improved.  *Id.*  She walked hunched over and reported weakness and "funny sensations" in her legs.  *Id.*  Her back was tender, mostly over the sacrum and common insertion of the posterior back flexors, and Dr. Matthews administered a bilateral steroid injection.  *Id.*  He also prescribed Ultram for short-term pain control, stated that her limitations at work included no lifting, stooping, or bending for 10 to 14 days and noted that she was not able to function in a classroom-type setting with the symptoms she was having because of the interactions with children.  *Id.*  An MRI taken the same day revealed degenerative disc disease and mild levoscoliosis.  Tr. 231.

On May 22, 2001, Walker was still tender in the buttock. Tr. 215. Dr. Matthews diagnosed persistent low back pain and sciatica irritation and referred her to Dr. George R. Throop, a neurologist. *Id.*

On May 31, 2001, Walker reported constant pain in her left parasacral/paralumbar region, as well as weakness in her left leg, to Dr. Throop. Tr. 304. A sensory exam showed diffuse decrease over the distal left leg encompassing multiple nerve root distributions. *Id.* Straight leg raise was positive on the left and negative on the right. *Id.* Dr. Throop diagnosed Walker with left lumbrosacral radiculopathy at uncertain level and a past history of the same right-sided symptomatology previously treated with a steroid injection. *Id.* Dr. Throop referred her to Dr. Ehlers for another steroid injection. *Id.*

On June 12, 2001, Walker continued to report weakness in her left leg. Tr. 222. She also continued to walk hunched over and changed position frequently upon exam. *Id.* Dr. Matthews released her to work at the light, sedentary level with frequent position changes, *i.e.*, every 10 minutes. *Id.* Due to her pain behaviors, Dr. Matthews did not think it was appropriate for her to be in a classroom setting because "it would be distressing for the children, although she would probably be able to function in that capacity." *Id.*

Two days later, Dr. Ehlers again administered a steroid injection, noting that Walker previously had an excellent response to the February 2001 injection. Tr. 179. Prior to the injection, Walker reported pain of 7 out of 10, which reduced 30 minutes post-injection to 6 out of 10. *Id.* Dr. Ehlers felt her response to the anesthetic was "incomplete, similar to the prior study" and advised awaiting a response to the steroids. *Id.*

8 - FINDINGS AND RECOMMENDATION

On July 11, 2001, in response to Walker's reports that she was still experiencing a lot of pain and the MS Contin was making her nauseous, Dr. Matthews diagnosed low back pain with persistent sacroiliitis and inadequate pain management.  Tr. 222.  Dr. Matthews prescribed a trial of Methadone.  *Id*.  However, within a week, Dr. Matthews discontinued the Methadone and prescribed Oxycontin because the Methadone was making Walker vomit.  *Id*.

Walker saw Dr. Matthews again on July 25, 2001, and his notes indicated that Walker was approaching a medically stationary point.  Tr. 221.  However, Walker was continuing to experience low back pain, was not sitting up, and moved frequently.

On August 7, 2001, Dr. Ehlers noted that Walker's symptomatology had returned one week after the last injection in June 2001.  Tr. 178.  She reported difficulty ambulating and had significant tenderness in the sacrum.  *Id*.  Dr. Ehlers cancelled the proposed injection and recommended a sacral MRI "to exclude destructive process."  *Id*.

Because the MRI was unremarkable, on August 10, 2001, Dr. Ehlers administered a sacralcaudal injection.  Tr. 176-77.  Prior to the injection Walker complained of pain at the level of 8 out of 10, which was reduced to 5.5 out of 10 immediately post-injection.  *Id*.

On August 16, 2001, Walker continued to report acute back pain on top of her previous chronic pain.  Tr. 221.  Dr. Matthews diagnosed her with chronic pain syndrome and referred her to Dr. Craig D. McNabb, an orthopedic surgeon, to assess potential physiatric management.  *Id*.

On September 4, 2001, Walker was examined by Dr. McNabb.  Tr. 188-89.  Walker reported numbness and tingling in her left great toe and low back pain radiating down into the left leg.  Tr. 189.  Dr. McNabb found a "positive piriformis stretch and strain on the left side" and was concerned she had "some sciatic nerve entrapment due to a tear of the piriformis."  *Id*.

9 - FINDINGS AND RECOMMENDATION

He referred her for an EMG which was normal.  Tr. 188.  Dr. McNabb then ordered an MRI of the left piriformis region.  *Id*.

Two weeks later on September 19, 2001, Walker returned to Dr. Matthews.  Tr. 220. Walker was continuing to take MS Contin and hydrocodone, which had given her "moderate relief."  *Id*.  She ambulated "hunched over, favoring her [left] buttock."  *Id*.  Dr. Matthews noted that, due to the acute onset, asymmetry, and consistent and localized nature of the symptoms, her condition was "a peripheral syndrome and not central."  *Id*.  He also expressed his belief that her presentation was "entirely straight forward" because he found "[n]o evidence . . . of significant chemical mis-use or any evidence of symptom embellishment, inconsistent exams, or anything." *Id*.

### D.  First Examination at the Request of Workers' Compensation Insurer

On October 29, 2001, about six months after the alleged onset date, at the request of her employer's workers compensation carrier, Walker was examined by Dr. William Courogen, an orthopedic surgeon, and Dr. Paul Eckman, a neurologist.  Tr. 120-26.  Drs. Courogen and Eckman found the fact that Walker's pain and impairment had worsened in the past six months, counter to their knowledge of soft tissue healing, and diagnosed a resolved lumbar strain "based on the knowledge of soft tissue healing in strains, particularly in ones which would be expected to be very minimal based on the mechanism described."  Tr. 124.  These doctors also diagnosed "severe non-organic pain behavior noted during the examination, specifically verbalization, give way phenomenon, non-anatomic sensory loss, crying, marked discrepancy between observed and measurable ranges of motion and exacerbation of pain by maneuvers which cause no motion or change in position in the area of pain."  *Id.*  They recommended a bone scan to exclude things

such as an occult malignancy and also "a thorough neuropsychiatric, psychosocial investigation."

Tr. 126.

The following day, Dr. McNabb noted Walker's continuing "significant pain and discomfort" and recommended a trial of injections at the site of the piriformis muscle and referred her to Dr. Lance J. Caddy.  Tr. 188.

In a December 21, 2001 letter to Walker's employer's claims representative, Dr. McNabb wrote that he did not concur with the opinions of Drs. Courogen and Eckman.  Tr. 295.  Instead, he felt there was definite pain behavior going on and was awaiting approval of piriformis injection.  *Id.*  He also noted that "most, but not . . . all soft tissue injuries resolve . . . in 6 to 12 weeks."  *Id.*

On January 11, 2002, Dr. Matthews also disagreed with the findings of Drs. Courogen and Eckman, noting that the "likelihood of this representing a primary psychiatric disorder, not related to her [workers] compensable injury is certainly less than 50 percent."  Tr. 292.  He agreed with a recommendation for "neuropsychiatric testing to provide a level of objectivity to the disputed allegations."  *Id.*

### E.  Trigger Point Injections and Second Examination by Non-Treating Doctors

On January 11 and 31, 2002, Dr. Caddy administered trigger point sacroiliac joint injections and acupuncture.  Tr. 170-75.  This treatment provided her some pain relief for a few days after the injections, but the pain returned.  On February 8, 2002, Dr. Matthews noted that Walker had decreased pain behaviors but "remains completely disabled due to pain level 6, which precludes any significant cognitive functioning and significant pain due to the piriformis syndrome precluding any significant physical capability."  Tr. 218.  He also noted that an

11 - FINDINGS AND RECOMMENDATION

"[o]utside review related to a neuropsychiatric testing would be welcome." *Id*.  By March 8,

2002, Dr. Matthews noted that Walker again hunched over, using a cane, and that her pain had

returned to a level 8.  *Id*.

Between February 19 and June 7, 2002, Dr. Caddy continued to administer trigger point

injections, sacroiliac joint injections, and acupuncture.  Tr. 151-69.  The injections provided

some pain relief for a few days following the injections, but the pain invariably returned.  In

addition, Walker also did piriformis stretches, which provided her with some temporary

reduction of her pain.  Tr. 151.

On April 29, 2002, again at the request of Walker's employer's workers' compensation

carrier, Walker was examined by Dr. Thomas Dietrich, a neurosurgeon, and Dr. Michael Marble,

an orthopedic surgeon.  Tr. 129-38.  Drs. Dietrich and Marble diagnosed Walker with resolved

lumbar strain, chronic pain syndrome, and possible narcotic habituation.  Tr. 135.  As did Drs.

Courogen and Eckman in October 2001, Dr. Dietrich and Marble recommended a bone scan.  Tr.

136.  However, they felt that there was no evidence of a "so called piriformis syndrome."  *Id*.

They believed that there might be an underlying organic explanation for her pain, although they

deemed that unlikely.  Tr. 138.  Instead, they viewed it as "more likely that her pain is

perpetuated by narcotic habituation" which "would have arisen from the accepted condition of

lumbar strain" and which "may require treatment and may keep her from returning to work until

this is resolved."  Tr. 137-38.  They concluded that "two possibilities" explained Walker's pain

complaints, namely:  "(1) [a]n undiagnosed source of pain in the pelvis/hip area" which needed

to be ruled out with a bone scan; or "(2) [p]ain perpetuation due to narcotic habituation" which

they suggested should be evaluated by a pain management clinic.  *Id*.

12 - FINDINGS AND RECOMMENDATION

Despite the opinion of those doctors that Walker had no pirifomis syndrome, Dr. Caddy

referred Walker to Dr. John Coen, an orthopedic surgeon, for evaluation for a piriformis tendon

release.  Tr. 151.  During a June 18, 2002, examination, Dr. Coen noted that Walker was very

uncomfortable with internal rotation of her hip and was "exquisitely tender over the area of her

mid buttock as well as just posterior to the greater trochanter."  Tr. 186.  Dr. Coen diagnosed left

hip piriformis syndrome and recommended a tendon release.  *Id.*  Dr. Coen felt that a piriformis

tendon release was "very reasonable to consider . . . given the severity of her symptoms and her

failure to improve with all that has previously been done."  *Id*.

Dr. Coen performed a piriformis tendon release on July 20, 2002.  Tr. 149-50.  Walker's

piriformis tendon was "unusually tight in orientation [but] was released without difficulty."

Tr. 149.  Dr. Coen anticipated that Walker would reach maximum medical improvement at three

months post-surgery.  Tr. 185.

A month after the surgery, Walker was still having moderate to severe pain.  Tr. 185.

Dr. Coen advised her to gradually increase the intensity and duration of her activities if she could

tolerate them.  *Id.*

Two months post surgery, on September 17, 2002, Walker reported some decrease in the

"grabbing" aspect of her pain that had radiated across her buttocks, but still had radicular leg

pain.  Tr. 184.  Dr. Coen was not certain he had anything more to offer her and recommended

consideration of some formal pain management program or implantation of a pump to relieve her

pain.  Tr. 183.

Two weeks later on October 1, 2002, Walker reported no significant improvement after

surgery.  Tr. 216.  Dr. Matthews found her "essentially medically stationary" and in need of

13 - FINDINGS AND RECOMMENDATION

chronic pain management.  *Id*.  He referred her for pain management, noting her good tolerance

of oral opiates and the lack of need "to go as far as implantable opiate administration."  *Id*.

On October 8, 2002, Dr. Coen found Walker medically stationary from an orthopedic

standpoint, but declined to do a closing examination for the employer's workers' compensation

insurance carrier because he does not routinely perform those.  Tr. 183.

Apparently in lieu of a closing examination by Dr. Coen, on November 14, 2002, Walker

was examined by Dr. Gerald Riemer, a neurologist, and Dr. Steven Schilperoort, an orthopedic

surgeon, again at the request of the insurer.  Tr. 280-88.  In this third independent examination,

these doctors disagreed with Dr. McNabb's concern that Walker had a sciatic nerve entrapment

due to a tear of the piriformis, finding it "virtually impossible" based on the history and

mechanism of injury.  Tr. 281.  Drs. Riemer and Schilperoort "basically [found] it impossible to

render a clinical diagnosis based upon her examination today and also based upon review of the

medical file."  Tr. 285.  Their impression was that Walker had pain syndrome, causation

unknown; lumbar strain by history, resolved; and was status post piriformis release.  Tr. 284.

They were "unable to conclude that [Walker] ever had a piriformis syndrome" and recommended

addiction and psychiatric evaluations.  Tr. 285.  They stated that Walker was on an extremely

high dose of narcotics and wrote: "Not knowing what her diagnosis is, we are unable to return

this woman to work at the present time, but would feel more inclined to do so after the

recommended evaluations have been carried out."  Tr. 286.

On February 12, 2003, Dr. Matthews wrote that he and Walker would "happily agree" to

the recommendation for an evaluation by a psychiatrist and a drug addiction specialist.  Tr. 273.

Dr. Matthews wrote that although Walker's injury was of a minimal nature, it was "entirely and

unpredictably possible for a relatively minor injury to result in a severe chronic pain syndrome

for reasons that are unclear." *Id*. He found Walker's "aberrant pain behaviors" directly related to

her pain syndrome and found no evidence to suggest otherwise other than the opinions of the

independent medical examiners. *Id*. "In summary, it is my opinion that the reason Mrs. Walker

acts as if her leg hurts severely and her [left] buttock hurts severely, is in fact because she has

ongoing symptomatology in her left buttock and leg of a severe nature." Tr. 274.

On August 5, 2003, Walker reported that she had tried to cut down on her medication but

the buttock on the left side asymmetrically hurt. Tr. 258.

On September 18, 2003, Dr. Matthews noted that Walker changed position fairly

frequently and consistently throughout an extended examination. *Id*.

## II. <u>VE Testimony</u>

At the November 10, 2004 hearing, vocational expert ("VE") Vernon G. Arne testified.

Tr. 335-40. The VE indicated that Walker's past relevant work included jobs as a teacher aide

(DOT 099.327-010, light, skilled, SVP of 6), a secretary (DOT 201.362-030, sedentary, skilled,

SVP of 6), a bookkeeper (DOT 210.382-014, sedentary, but performed by Walker at the light

exertional level), and a sales clerk (DOT 290.477-014, light, semi-skilled, SVP of 3). Tr. 335-

36.

The ALJ posed a hypothetical question to the VE, asking him to assume the claimant was

55 years old, with a high school education with some additional training, limited from lifting and

carrying more than 10 pounds frequently, with an occasional 20 pound maximum, limited to

occasional stair climbing, stooping, bending over, keeling, crouching, and crawling, needed to

avoid vibrations and hazards, and was unable to climb ladders. Tr. 336. In response, the VE

testified that the individual would still be able to work as a secretary or a bookkeeper, but that if the individual were further limited in her ability to perform complex tasks due to deficiencies in attention and concentration, those semi-skilled jobs would be eliminated. Tr. 336-37. The ALJ also opined that, due to her age, the hypothetical claimant would need to have transferrable skills in order to perform other work. Tr. 338. He identified two such sedentary jobs, namely jobs as a medical voucher clerk (DOT 214.482-018, semi-skilled, SVP 3) and a sorter (DOT 209.687-022, semi-skilled, SVP 3), which he testified would utilize the transferrable clerical practices acquired as a secretary and a bookkeeper. Tr. 338-39.

In response to further questioning, the VE clarified that even those jobs would be eliminated by a need to change position including moving away from the work station or reclining that occurred outside normal break times. Tr. 340.

## DISCUSSION

Walker challenges the ALJ's rejection of her testimony, as well as the opinions of her treating doctor. For the reasons that follow, this court finds that the ALJ erred by rejecting Walker's testimony and by failing to further develop the record with regard to Walker's chronic pain syndrome diagnosis and possible related narcotic habituation.

## I. Rejection of Lay Testimony and Examining Physician Opinions

### A. Lay Testimony

#### 1. Legal Standard

If a claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged and no affirmative evidence of malingering exists, the ALJ must assess the credibility of the claimant regarding the severity of

symptoms. *Smolen v. Chater*, 80 F3d 1273, 1281-82 (9th Cir 1996). The ALJ may discredit a claimant's testimony regarding the severity of symptoms by providing clear and convincing reasons for doing so. *Id* at 1283; *Dodrill v. Shalala*, 12 F3d 915, 918 (9th Cir 1993). It is not sufficient for the ALJ to make a general assertion that a claimant is not credible. The ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill*, 12 F3d at 918; *Lester v. Chater*, 81 F3d 821, 834 (9th Cir 1995); *Reddick v. Chater*, 157 F3d 715, 722 (9th Cir 1998).

When making a credibility evaluation, the ALJ may consider objective medical evidence together with the claimant's daily activities; the location, duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment other than medication; measures used to relieve symptoms; and functional limitations caused by the symptoms. *Smolen*, 80 F3d at 1284; *see also* SSR 96-7p. In addition, the ALJ may rely on:

> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. . . . The ALJ must also consider . . . the claimant's work record and the observations of treating and examining physicians and other third parties regarding, among other matters, the nature, onset, duration, and frequency of the claimant's symptom; precipitating and aggravating factors; functional restrictions caused by the symptoms; and the claimant's daily activities.

*Smolen*, 80 F3d at 1284 (citations omitted).

Friends and family members and others in a position to observe a claimant's symptoms and daily activities are also competent to testify as to the claimant's condition. *Dodrill,* 12 F3d at 918-19. Such testimony cannot be disregarded without comment. *Nguyen v. Chater*, 100 F3d 1462, 1467 (9th Cir 1996). If the ALJ wishes to discount lay witness testimony, he must give reasons that are germane to the witness. *Id.*

### 2. **Testimony**

At the hearing, Walker testified that since her injury in April 2001, she has been unable to work due to the debilitating pain in her back and left buttock which requires her to alternate positions, and spend most of the day reclining in a chair to keep the pressure off of her left hip. Tr. 327-28. She takes a combination of morphine, codeine, and a muscle relaxer throughout the day and performs stretching exercises in order to try and get some relief from the pain. Tr. 322-23. She ambulates with a cane to prevent falling and is unable to walk more than short distances due to the pain it causes. Tr. 325-26. In her written reports, Walker stated that her husband assists her in and out of the bathtub and that she is fearful of falling in the shower. Tr. 107. Walking, sitting, or standing for too long all exacerbate her pain and she has to rest about every 10-15 minutes. Tr. 75-76. This is a dramatic change from the life Walker led previously, as testified to by Walker and reflected in testimony and documentary evidence submitted by other lay witnesses.

Prior to April 2001, Walker had a record of consistent employment (Tr. 43-47, 52) and was by all accounts an exemplary employee who would stay after work to finish up projects that did not get done and help any teacher who needed extra assistance. Tr. 118. She was also very active socially, participating in a variety of activities with friends and family and in the

community.  Tr. 76, 80-82, 118, 331.  Both her former coworker and friend, Cathy Burnett, and her husband relayed that since April 2001, Walker has been unable to work, participate in the multitude of activities she formerly did, and has ceased doing nearly all household chores other than folding the laundry twice a week.  Tr. 76, 118, 85-96, 330-31, 333-34.  She now leaves the house only five or six times a month (Tr. 86) to go to the grocery store (once a week) and visit her doctor or pick up prescriptions.  Tr. 86.  Her husband helps with the grocery shopping because she is unable to load and unload the grocery cart.  Tr. 330-31.  She rarely drives (Tr. 88), no longer takes walks (Tr. 89), and no longer dusts, vacuums, takes out the trash, or does yard or garden work (Tr. 76-77, 79-80, 92).  She is also unable to concentrate like she used to (Tr. 118) and her husband has taken over paying the bills (Tr. 80, 94).  She spends the bulk of her time reclining trying to stave off the pain in her back and left hip.  Tr. 95, 327-28.  Bending or picking up things weighing as little as 10 pounds aggravates her pain.  Tr. 324, 328-29.

Mr. Walker confirmed that since her injury in 2001, his wife has been unable to walk very well and ambulates with a cane.  Tr. 333.  She is unsteady on her feet and he has had to pick her up after she has fallen down several times.  Tr. 334.  She cannot sit or stand for any length of time, is "squirming all the time," "can't set still," and looks like she is in a lot of pain.  Tr. 333.  She is also unable to do many of the household tasks she performed prior to the injury, including vacuuming, sweeping, or planting flower gardens.  *Id*.  On "bad" days, she is in bed or reclining in a chair most of the day trying to be comfortable.  Tr. 334.  On "good" days, they "can go shopping and walking around a little bit but she can't walk for long without hurting."  *Id*.

///

///

19 - FINDINGS AND RECOMMENDATION

3. **Analysis**

The ALJ found Walker not credible concerning the alleged extent of her disability since April 2001 based on the lack of any "objective clinical laboratory findings that would support [her] symptoms" and his conclusion that her "allegations are extremely disproportionate to the objective findings in the medical record." Tr. 18.  He also noted that "most of the medical experts disagree with [the diagnosis of piriformis syndrome]" (Tr. 18) and that "specialists noted a marked discrepancy between measurable ranges of motion and observed ranges of motion" as well as an "exacerbation of pain by maneuvers which caused no motion or change of position in the area of pain" which "would suggest that [Walker's] reported pain behavior is not a result of physical impairments."  Tr. 19.

The ALJ correctly noted a direct conflict between the opinions of the examining doctors hired by the compensation insurance carrier and the opinions of Walker's treating doctors over whether she ever had piriformis syndrome.  However, because the pain that is the basis of her disability claim was not relieved by the pirifomis tendon release operation, that dispute is immaterial.  The issue is limited to whether any remaining diagnosis supports Walker's testimony of debilitating pain.

Because it alleges chronic pain syndrome,[4] Walker's request for DIB is premised upon both physical and mental impairments:

---

[4]  The essential feature of Pain Disorder is pain that is the predominant focus of the clinical presentation and is of sufficient severity to warrant clinical attention.  The pain causes significant distress or impairment in social, occupational, or other important areas of functioning.  Psychological factors are judged to play a significant role in the onset, severity, exacerbation or maintenance of the pain.  The pain is not intentionally produced or feigned as in Factitious Disorder or Malingering.  Laboratory tests may reveal pathology that is associated with the pain. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th Ed.) p. 458.

> [C]hronic pain syndrome] has both a physical and psychological
> component.  Pain merges into and becomes a part of the mental
> and psychological responses to produce the functional
> impairments.  The components are not easily separable.  Given that
> the consequences of [claimant's] physical and mental impairments
> are so inextricably linked, the Commissioner must consider
> whether these impairments *taken together* result in limitations
> equal in severity to those specified by the listings.

*Lester*, 81 F3d at 829-30(emphasis in original; internal citation and punctuation omitted).

Multiple doctors have diagnosed Walker with chronic pain syndrome and recommended follow up by a pain clinic.  The ALJ discredits Walker in part based on the lack of "objective clinical laboratory findings."  However, the record in this case does not support that reasoning.

First, there is objective evidence in the record to support Walker's pain complaints.  The record reveals x-ray evidence of a fracture to Walker's sacrum in September 2000 and an MRI revealing degenerative disc disease and mild levoscoliosis in May 2001.  Tr. 226, 231.  In addition, Dr. Coen noted the unusual tightness in Walker's piriformis tendon prior to performing the piriformis release.  Tr. 185.

Second, there is a long history of the diagnosis of chronic pain syndrome and a long history of doctors attempting, through various means, to treat Walker's complaints of pain, without any indication whatsoever of malingering.  Dr. Matthews has repeatedly diagnosed chronic pain syndrome, noted the severity of Walker's pain behaviors, and disagreed with any suggestion that Walker is malingering or driven by issues of secondary gain.  He and other doctors have repeatedly treated her for the pain without ever suggesting that Walker's complaints of pain are not credible or exaggerated.  Dr. Matthews has also noted the consistency of her symptoms since the alleged onset date and the reproducible pain behaviors generated by

palpatation of the posterior aspect of her left hip joint. Tr. 255. Each team of doctors that

examined Walker on behalf of her employer's workers' compensation insurer also recommended

additional testing. Tr. 126 (October 29, 2001, Drs. Courogen and Eckman recommending a bone

scan and "a thorough neuropsychiatric, psychosocial investigation"); 136 (April 29, 2002, Drs.

Dietrich and Marble recommending evaluation "by a pain management group for evaluation of

what appears to be a chronic pain syndrome with increasing narcotic requirements" and a bone

scan); and 285 (Drs. Reimer and Schilperoort recommending that Walker have "an addiction

evaluation and a careful psychiatric evaluation before recommending any further [therapeutic]

measures."). When the piriformis release failed to alleviate Walker's symptoms, Dr. Matthews

fully supported the suggestion that Walker be evaluated by a psychiatrist and drug addition

specialist. Tr. 273. However, the record does not reveal that such evaluations were ever

undertaken.

Finally, despite Walker's lengthy treatment record, there is no suggestion that Walker is

malingering or that her symptoms have anything other than a legitimate physical or mental basis.

To the contrary, Dr. Matthews has repeatedly noted the lack of any such evidence (*see*, *e.g.*,

Tr. 219-20, 273-74), and no other treating, examining, or reviewing doctor has suggested

malingering or elaboration of symptoms driven by issues of secondary gain. Instead, the record

contains recommendations by the examining doctors, as well as the treating doctor, that the basis

for Walker's consistent and ongoing pain should be examined by a pain clinic and that Walker

should be assessed by an addiction specialist.

In sum, the ALJ's reasons for rejecting Walker's testimony of disabling pain do not

withstand scrutiny. The ALJ failed to recognize that pain can be severe to the point of being

disabling even though it has no diagnosable cause. The record contains no basis to reject the unanimous advice of the treating and examining doctors that Walker's chronic pain syndrome and possible narcotic habituation be further evaluated. Without awaiting the results of the additional testing recommended, the wholesale rejection of Walker's testimony about how her pain affects her daily activities and ability to work rings hollow.

**B. Opinions of Examining Physicians**

**1. Legal Standard**

The ALJ may reject an examining physician's opinion that is inconsistent with the opinions of other treating or examining physicians if the ALJ makes "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Thomas v. Barnhart*, 278 F3d 947, 957 (9th Cir 2002) quoting *Magallanes v. Bowen*, 881 F2d 747, 751 (9th Cir 1989); *Lester*, 81 F3d at 830. An uncontradicted opinion may be rejected for clear and convincing reasons. *Thomas*, 278 F3d at 956-57. Moreover, in a social security disability benefits case, a physician's opinion of disability, premised to a large extent upon the claimant's own accounts of his symptoms and limitations, may be disregarded where those complaints have been properly discounted. *Brawner v. Secretary of Health & Human Servs.*, 839 F2d 432, 433-34 (9th Cir 1988); *see also Lawson v. Massanari*, 231 F Supp 2d 986 (D Or 2001).

**2. Analysis**

Walker argues that the ALJ improperly rejected the opinion of her primary treating doctor, Dr. Matthews. Over the course of his treatment of Walker since April 2001, Dr. Matthews has opined that he does not think Walker can perform her previous job as a teacher's aide (Tr. 261, 278), is able to work (Tr. 217), and would be able to maintain a job for

eight hours a day, five days a week, without missing more than two days of work a month (Tr. 255).

The ALJ rejected Dr. Matthews' opinions that Walker would probably never be able to return to work at her position as a teacher's aide (Tr. 19), but also found that Walker could not perform that job any longer, mooting the question of whether that opinion was properly rejected. The ALJ also rejected Dr. Matthews' opinion that Walker would be unable to perform light or sedentary work on a continuous and reliable basis because she would likely miss more than two days of work a month. *Id*. In rejecting that opinion, the ALJ stated:

> Since this doctor has acknowledged that he does not know what is causing the claimant's symptoms and since the record does not provide any objective medical findings that provide a basis for missing three, four, or five days of work per month, minimal weight is given to this conclusion. The opinion regarding absences would appear to be predominantly based on the clamant's subjective reporting rather than being supported by objective medical findings.

Tr. 19.

As discussed above, some objective evidence supports Walker's allegations of pain, but no follow up was ever done to further evaluate her chronic pain syndrome. As with the lay evidence concerning the extent of Walker's limitations, an assessment of Dr. Matthew's opinions regarding Walker's ability to sustain gainful employment turn in large part on whether her chronic pain syndrome can be better assessed and managed. The lack of any further assessment prevents any reasoned analysis of both the lay testimony and of Dr. Matthews' opinions going to the ultimate issue in this case. Accordingly, assessment of those opinions must also await further proceedings.

24 - FINDINGS AND RECOMMENDATION

II.  **Ability to Perform Past Work or Other Work**

      As discussed above, the additional examinations unanimously recommended by the treating and examining doctors to fully evaluate Walker's chronic pain syndrome and possible related narcotic habituation have not occurred.  Without that information, it is impossible to assess the lay testimony and observations concerning Walker's pain and related limitations and to make any educated judgment about what jobs, if any, Walker may be able to perform.

      The record does contain evidence that Walker is unable to sit for long periods of time, which the ALJ recognized as a potential problem in being able to perform sedentary work. Tr. 21.  Due to limited attention and concentration, the ALJ identified only two jobs that Walker could still perform, both of which are sedentary.  *Id.*  If the ALJ improperly discredited Walker's testimony and other evidence concerning her inability to sit for long periods of time, then neither of these jobs appear to be appropriate.  However, the credibility finding hinges in large part on the lack of objective evidence which, in turn, requires further exploration of the chronic pain syndrome diagnosis and possible narcotic habituation.

      At best, it is premature to delve into Steps 4 and 5 of the disability analysis, and this case should be remanded to the Commissioner for exploration of these omissions.

III.  **CONCLUSION**

      The record reveals significant limitations on Walker's functioning and clearly suggests that those limitations may be the result of mental health issues which contribute to her physical limitations.  The lack of follow through on Walker's chronic pain syndrome diagnosis and the possibility of narcotic habituation prevent any educated analysis of Walker's entitlement to an award of benefits.  A thorough review of the record reveals unresolved issues, namely the

relationship between Walker's physical symptoms as reflected in her diagnosis of a chronic pain syndrome and a mental disorder, and the possibility that successful treatment of her symptoms is complicated by narcotic habituation.  These issues cannot be resolved at this juncture.

## RECOMMENDATION

Based on the reasons set forth above, the Commissioner's final decision should be REVERSED and REMANDED pursuant to sentence four of 42 USC § 405(g) for further administrative proceedings.  On remand, the Commissioner should further develop the record as suggested by all of the treating and examining doctors, reevaluate Walker's credibility in light of those findings, and assess any other lay testimony as corroboration of Walker's testimony.  The Commissioner also should reevaluate all opinions by the medical providers since April 2001, reevaluate Walker's RFC and, if necessary, elicit testimony from the VE with a hypothetical question that accurately reflects all of Walker's limitations.

## SCHEDULING ORDER

Objections to these Findings and Recommendations, if any, are due **September 18, 2006.** If no objections are filed, then the Findings and Recommendation will be referred to a district judge and go under advisement on that date.

If objections are filed, then the response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendations will be referred to a district judge and go under advisement.

DATED this 31st day of August, 2006.

/s/  Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge